May it please the Court, Brian Altman on behalf of the Appellant, Todd Alan Feldman. Your Honors, the Government in essence hoodwinked the Kingdom of Spain when it omitted key facts and key provisions of law in the affidavit that it submitted to Spain in support of the Appellant's extradition. For example, the Government never let Spain know that it revoked the original plea agreement it submitted as a basis for extradition. Since the Appellant had failed to appear for sentencing under a trial in 1997, the Government decided that it would seek to have the Appellant punished essentially for failing to appear. Notwithstanding that the bilateral treaty on extradition that exists between our two countries does not allow anyone from being detained, tried or otherwise punished for any offense that is not also an offense of the country from which extradition is being requested. That's referred to as the Doctrine of Specialty. Despite that, the Government, in some ways it could be argued, deceived Spain by submitting the original plea agreement. It never had any intention of allowing the Appellant to enter a plea to the original plea agreement. The treaty requires our ---- Wait a minute. Wait a minute. Wait a minute. At the time that we requested extradition from Spain, Mr. Feldman was under indictment for defrauding British Airways. That's correct. Okay. And that law certainly was disclosed to Spain, wasn't it? The indictment, the original indictment and the original plea agreement were submitted to Spain. They submitted, in fact, the mail front statute. They never submitted to Spain, for example, any of the statutes related to supervised release. They didn't submit anything related to restitution. When you go to another country as part of this extradition, when you're going to basically withdraw a legal resident of Spain, you must submit what the law of the offense is and what the law of the punishment is. Do we have to submit the whole sentencing guidelines to Spain? Well, they have to submit what the person is actually facing. It would be the same thing that we'd want to know. If someone was going to be removed from the States, we'd want to know, what do they face when they get to this other country? What are the punishment possibilities? What exactly is the punishment? The Government concedes that it didn't submit the supervised release and that it is punishment. It's a restriction that's placed on someone that is convicted of a crime, and it is a substantial invasion and a restriction on their life for, in this case, a significant period of time. Initially, the Government didn't know what would unfold in the case when they asked to extradite him, did they? I'm sorry? The Government didn't know what would unfold in the case when they asked Spain to send him forward. I'm not sure that I understand the question. The Government knew that it, for example, it knew that it had an indictment. It knew that it had once offered a plea agreement, the original plea agreement. It knew what the laws were. It knew what the punishment that the appellant faced. It also knew that it had a substantial motion that it had opposed, relating to post-indictment and pre-indictment delay that was at one point in time pending, that was reanimated. Did it know that Mr. Feldman would make certain statements as to what he would do and then not do it? The Government did not know whether or not Mr. Feldman would, well, there's no point to submit the original plea agreement unless you are attempting to essentially show Spain what the appellant faced. They're saying, here's the plea agreement, this is the punishment, and under the terms of the treaty, he can be, and with the law that we've provided to Spain, he can either be imprisoned or he can be imprisoned and or fined. And that's what he faces. So here's the plea agreement. Let's just bring him back so that he can just serve up his time or serve this sentence, actually. But it did not know specifically whether, well, I would posit that the Government knew that it was not going to But it did not know, I would believe that it did not know what the appellant would ultimately do, whether he would insist on his right to a trial, whether he would enter into some kind of a negotiated plea. But had you proceeded to trial and had you been found and had he been convicted by a jury, Spain knew what the ultimate penalty was under U.S. law for that, didn't it? No. It only knew what the penalties for the violation of the Mail Front Statute. It did not know all the other penalties. For example, it did not know that he faced a restitution, a substantial restitution. It did not know that he faced a supervised release. Here's one of its legal residents that provides, pays taxes, has a business, has all of his life centered in Madrid, and he's removed, and they think that, or they could only think, based on what they had to review that was presented by the Government, that he faced imprisonment and a fine, or imprisonment and or a fine. That's what Spain knew. That's the only thing that Spain could have known. And that was the representation of the Government by its own admission and also by the papers that were submitted. Mr. Altman, have you looked at what we've done in other cases with Spain or with other countries? I have looked at other cases. I don't have any other case involving Spain. Okay. With respect to other countries, is it U.S. practice, or was this a departure from U.S. practice here, that do we usually provide all the possibilities of supervised release and tell them that there might be a $100 special fine imposed by the judge, or there might be special terms of, do we have a restitution statute? Are all those things always provided to other countries, so this was a departure from U.S. practice here? Well, I do know where we have with this Court, I believe it is this Court, that has looked at where there's been merely a procedural violation. For example, in the Antinakis case that the Government cites, they omitted in the papers that they submitted to the requested country something about the deadline related to when certain offenses took place. In this case, though, this cuts to the heart of the substantive right of specialty. Actually, the idea that you can impose supervised release essentially keeps someone here for five years, keep them away from Spain, that's not just merely a procedural, well, here's a fine, or here's a court cost, or here's a cost of probation supervision. This is actually a very substantive issue, and it never revealed that to Spain. What should the United States have provided them? Well, they should have provided them all the punishment statutes, which is the supervised release. Okay, give me the title numbers. I believe that is 18 U.S.C. 3553 and 3583. Okay, and those will deal with questions of supervised release? Yes, that relates to supervised release. In addition, the Government failed to inform Spain of the fact that there was a substantial issue as to the statute of limitations. It omitted a fair amount of information, as I've already admitted, the supervised release, the restitution, and now this substantial issue of the statute of limitations. Therefore, the imposition of supervised release on Mr. Felton, on the appellant, was a violation of the treaty. In addition. Did you argue all this in the district court? Yes, well, this was the argument that supervised release, we did not argue the supervised release, what we did is we preserved that for appeal and the basis upon not mentioning supervised release at the time of sentencing is that the appellant and counsel were led to believe that the appellant would be allowed to return home to Spain and that he could essentially be supervised from Spain, where it would not have been an arduous and invasive restriction on his life, where he could have paid restitution, he could have been supervised overseas, he could have returned to his business, returned to his friends, returned to his essential family. And what changed all that? I'm sorry? What changed? What was the cause of the change that that didn't occur? Because after sentencing, it was the appellant and counsel learned that he was now restricted to the central district, that it was actually for the term of supervised release. So it wasn't the supervised release that was the problem. It was that he was restricted to the Los Angeles district. Yes, except that the lynchment for that is the condition is predicated on the supervised release, and the supervised release is an additional punishment that was never revealed during the extradition lawsuit. And you did not argue this treaty with Spain argument you're giving to us? You didn't argue that? Yes, that was argued. That was argued in the district court? In addition, the actual sentence that was imposed must be vacated in light of the Supreme Court decision of United States versus Booker. The appellant never admitted submitting credit card reflow notices that were never part of the indictment. He did not admit the amount of loss that the court ultimately made a factual determination as to. And I believe that Booker holds that the Sixth Amendment is violated by the imposition of an enhanced sentence under the guidelines based on the sentencing judge's determination of a fact that wasn't found by a jury or admitted by the defendant. I think the case must be remanded on that basis alone. And finally, the last part of my argument is that by failing to provide Mr. Feldman, the appellant would notice that it intended to restrict him to the central district. The court violated federal rule of criminal procedure 32. It amounts to an upward departure, as indicated in my papers. Thank you. May it please the court. Eric Silber on behalf of the United States. I'd like to first point out that the government, in fact, disclosed in two separate ways the defendant faced a three-year term of supervised release to Spain as part of the extradition process. First, at ER 336, which is government's extraditive record 336, and this is also at defendant's extraditive record 36, there's a list of exhibits attached to the affidavit for extradition. Those exhibits include Exhibit F, which includes the penalties. It also includes a separate exhibit, Exhibit B, but I'll focus on Exhibit F to begin with. Exhibit F is at government's extraditive record page 359. It is not in defendant's extraditive records. At Exhibit F, at government's extraditive record page 359, the United States informed Spain that the maximum penalties the defendant faced for his offenses in the United States included a three-year term of supervised release. The government listed it in the maximum possible penalties the defendant faced in this case. Apart from that, in Exhibit B, which is at government's extraditive record page 345, the government also attached the plea agreement, which listed the maximum penalties available for this offense and again included the defendant faced a three-year maximum supervised release. So in two separate instances, Spain had actual noticed the defendant faced this penalty, both in the government's listing of this as a penalty for the offense and apart from that in the plea agreement, which listed the maximum penalties. The problem, to the extent one existed here, was that the government didn't provide an actual copy of the supervised release statute. But as we indicated, Spain was aware of the penalty. They chose to extradite the defendant despite not having a copy of the supervised release statute. And given that they knew that he faced that penalty, it was a mere procedural violation in this instance. I mean, it's really no different than missing the filing deadline, as was the issue in Anitakis. I mean... So what should the government have provided? I think in actuality it should have provided a 3583. I don't know that I agree that it should have provided 3553. I think all the government had to provide was that he faced the punishment, which is the penalty, which is a 3583. And do you know whether the government routinely provides that section to other countries? I'm sorry, I don't know the answer to that. I'd be happy to submit something if the court would like me to. My belief would be that it's not, but I don't have an informed basis for saying that. So I would be happy if the panel would like to submit something. I would note here it's important to recognize that when Spain extradited the defendant, they believed that he was going to face a five-year penalty for each offense for 14 counts of indictment, which meant he was going to be in prison for 70 years or possibly faced a 70-year prison sentence. It's hard to believe in that context that Spain would have objected to the defendant serving two years in prison and three years on term of supervised release, which in this case then means he couldn't return to Spain for five years as opposed to the 70 years that Spain knew about. I would also note I disagree with the assumption that the reason that Spain cares about the kind of the maximum penalty, why the treaty makes the maximum penalty relevant, is so that Spain can simply exercise its discretion not to extradite someone. I mean, there are penalty provisions in the treaty, and that's why the penalty is relevant. In Article 2 of the treaty, an offense is only extraditable if it has a statutory maximum penalty of a year or more in prison. Under Article 7 of the treaty, if it's a death penalty offense in the United States, Spain will not extradite a defendant unless the United States agrees not to seek or execute a death sentence. So I believe that Article 10 is simply determining whether the offense is extraditable. Here there's no question that his offense has made him extraditable. I mean, that has been undisputed. So, I mean, I disagree to some extent with even the reason the punishment statute needs to be provided. But certainly here they were informed of the actual punishment, and Spain chose to extradite him anyway without asking for the statute. It is Spain's right under the treaty. I mean, this Court has made clear, apart from Anitakis, in cases like Merritt and Najon, that the rights under the treaty exist for the countries, not the individual. And if the country chooses to waive a right, the defendant can't serve it. In Merritt, for example, the defendant argued that the extradition treaty between the United States and South Africa required a warrant of extradition as part of the extradition process. And in that case, that hadn't been done. Now, this Court questioned whether that was, in fact, required under the treaty. But this Court said, assuming it was required under the treaty, South Africa could choose to extradite the person without complying with that. It's not the defendant's right. And that was the same point in Anitakis. It was a procedural violation. It's up to the country to enforce. The country knows about the violation at the time. And if they choose not to enforce it, it's not the defendant's right to serve. I would note, as to, although I would ordinarily address waiver first, I wanted to at least get to the points that Spain had notice of this. But I would say that this issue has to be reviewed in this report. The defendant knew he faced a term of supervised release. In fact, he knew he had a minimum term of supervised release, as the PSR indicated in paragraph 109. He had a two-year minimum term of supervised release. The defendant clearly knew about this treaty because he tried to enforce provisions of the treaty in particular Article 13 in a doctrine of specialty, both to enforce the plea agreement and for the loss determination before the district court. So he was aware of the treaty provisions, and he was aware he faced supervised release. And he chose not to object to the term of supervised release in the district court, in this case, on these grounds. In that context, he knew about his rights. He voluntarily chose not to raise it. And I think this is waiver rather than forfeiture, as this Court has indicated on Bonk and United States v. Perez. I mean, there's a difference between doing it here when you knowingly relinquish a right. It's waiver. What about, are you going to get to the notice that he can't leave the central district? He contends that he was not given notice of that. And I think you say that's part of Rule 32 or something to that effect. Yes. Well, what the Supreme Court indicated in Burns that if there's the court's going to depart, and there it was dealing with a guideline departure, that the defendant must have notice of it. Now, the notice in that case could come from the court, it could come from the PSR, or it could have come from the government. The Supreme Court didn't care where the notice came from, just the defendant actually had notice. What this Court indicated in Lopez is the same principle would apply to conditions of supervised release if it's kind of an unusual condition. That case dealt with a mental health evaluation, and this Court indicated there that, well, that's listed in the guidelines as a special condition, and therefore the defendant kind of essentially has implied notice from it, or at least it's not an unusual condition that constitutes a departure from the guidelines. In Wise, this Court made the same point again and highlighted that if it's listed in the guideline as one of the available conditions, then it doesn't require notice. You kind of have presumptive notice under the guidelines of those conditions. Here, in Wise, the condition that was at issue was having the defendant stay away from her child, and that was not one of the listed conditions, and this Court held that notice was required. Here, the travel condition is listed not only as one of the conditions, it's a standard condition under the guidelines, as opposed to the special condition that was at issue in Lopez. On top of that, as we indicated under General Order 318, this is a condition that applies in every case. I mean, there's not a basis to say this is a departure. This is a condition that is imposed in every case in the Central District of California. We attach that General Order as the appendix to our brief. And apart from whether the defendant should have had notice, as we indicated at ER 217, the defendant had notice that he would have to comply with General Order 318. The Probation Office indicated that in the recommendation letter in this case. In Burns. What about the need? Is there a need for remand under Ameline here for reconsideration of the served sentence or the supervised release? I know that Ameline doesn't apply to supervised releases, I recall. Is there any need to remand here? The government would disagree that there's a need to remand in this case. As Your Honor indicated, the defendant has served his entire prison sentence. There's really, at this point, there's nothing that can be done about that. If the court were to choose to exercise his discretion to have given a lower prison sentence originally, there's nothing that can be done about the prison sentence itself. Are there collateral consequences to the sentence that he served that might indicate a purpose for going back for an Ameline remand? Not that I'm aware of. When this Court addressed this issue in Verdon in dealing with mootness, when the prison sentence had been fully served and the question was whether the defendant could then challenge the sentence and appeal, again, that's not an Ameline remand. This Court held that the reason it wasn't moot and the reason it could be remedied is because on remand the district court could choose to impose a lower term in supervised release in light of what would have been the lower prison sentence originally. We don't disagree that that could happen in this case. I mean, the district court would have discretion. It couldn't credit the defendant, as the Supreme Court indicated in Johnson, for the time, any extra time he spent on supervised release, but the court could on remand conclude that, well, in light of the fact that I would have given a one-year rather than a two-year sentence originally, I would have chosen to give less of a term of supervised release. The problem here is that the defendant filed a motion after sentencing this case and after Blakely and Ameline 1 came down, saying that the court should stay the term of supervised release in light of those decisions. And the district court addressed this issue at Government Secretary Record, page 504. The court indicated that it thought that the three-year term of supervised release was the appropriate term in this case and that it best served the rehabilitative purposes. And the court did that. So the district court considered this post-Booker? It didn't consider it post-Booker, so it didn't know that the guidelines were advisory, although given that it imposed a three-year term of supervised release at the time of sentencing, it had discretion to impose that term all along. I mean, there was a minimum term of two years that it had to impose, but having chosen the three-year term, that was always discretionary. But what it did know is that there might have been a problem with the loss calculation under the guidelines. In fact, the court noted that at Exeter Record, page 503, going on to page 504, Government Secretary Record, in discussing the restitution issue, because the defendant also asked to stay restitution at that time, and the court noted that. Its calculation of loss as the court making the calculation for restitution purposes wasn't affected by Blakely and Ameline, although the loss under the guidelines might have been. So the court recognized there might have been a problem with its prison sentence under those decisions, Blakely and Ameline, but nevertheless felt that the three-year term would best serve the rehabilitative purposes. Now, of course, there is a difference. I see my time is up. Please finish your thought. There is a difference between, obviously, Blakely and Ameline, one, because those cases held that there was a Sixth Amendment right to have a jury make the determination, whereas Booker said that that's the right, but that's only the right under a mandatory guideline system, and now the remedy is to make the guidelines advisory. So now there isn't a right to have the jury to make the finding. What there is a right is to a determination under the discretionary guidelines about what the appropriate sentence is. So there are slight differences between what the court would be thinking about under Booker and what it would have been thinking about under Blakely and Ameline. But I do think the important point is that the court realized there might have been a problem with prison sentence, was aware at least of the Sixth Amendment issues, but nevertheless felt that the three-year term was the appropriate term. And in light of that, I think, as this court indicated in Ameline 3, there is a basis on this record to reliably determine that the sentence wouldn't have been different in the district court had the court only known it had discretion under Booker under the guidelines. Okay. Thank you, counsel. Thank you. Mr. Altman, we'll give you – I think you've consumed your time. We'll give you a minute. Thank you. Your Honor, I do not know the basis for the government's assertion that notice can come from anywhere under Burns. Notice for purposes of supervised release, notice of that as a condition must come from the court. In addition, as applied to him, the requirement that he remain in this district is an upper departure. It becomes a special condition, and that's clear under United States v. Irwin. Because as applied to him, and the courts look at this. For example, in one case where they imposed a standard condition of someone putting on the Internet, the court of appeal found that that was actually unjust and arduous as applied to that particular defendant. And here, with the appellant's having his whole life based in Spain, his entire adult life essentially has been in Spain, his business is in Spain, his primary personal relationship is in Spain, for him to remain here as a condition of supervised release becomes an upper departure. It actually becomes a departure that for which notice is required. Counsel, I'm sorry. Go ahead. Does it make any difference when we look at the record that we see what happened when he was permitted to reside in Spain? When he failed to return, Your Honor? Yes. At heavy risk to his family. Yes. At heavy risk to his family. And he paid his debt for that. And he is continuing to pay his debt for that. And that was wrong. He never did. I know, but the court imposed a term. However, that condition of supervised release that allows for purposes of restitution was enacted after the date of the offense was here. But the court nonetheless went ahead with that. The difficulty, and the only reason I ask you the question, is I understood you arguing earlier he could be supervised in Spain. Well, the record could suggest that no, he can't be supervised in Spain because if he could have been supervised in Spain, he would have come when his time to report arrived, especially after he had agreed to do so and his family host, I think, 200,000 assets which they forfeited. So I don't see how he could have been supervised in Spain. If he's going to be supervised at all, I think the court could decide we have to keep him here on this record. I appreciate that because the record also shows that for this one offense, these credit card refund notices that occurred in, I believe, 1990, and the government essentially arrested him eight years later, seven or eight years later, and then waited an additional five years when he failed to return from Spain. The record shows that he made a substantial error in failing to return. Just to close, my last thought is that I don't believe that this court should simply accept the government's kind of determination that the lower court would change its mind in terms of the Booker and Ameline error in this matter. So do you want the sentence reviewed in this case? Well, I would like the supervised release condition, and I would like that reviewed. But that was already discretionary in the district court. So telling them that there was nothing mandatory about the supervised release conditions that were placed on your client. That is correct. And you don't want us to review the question as to whether he should get more or less time for time service. You're not asking us to send it back then to review the sentence, only the questions of supervised release, as to which the district court already has exercise discretion. Exercise discretion pre-Booker. Right. But the guidelines didn't mandate the terms of supervised release. That's correct. He already had discretion there. So what is there to send back? Because I'm unsure if I agreed with you what kind of an order I would give to the district court. Well, in the first instance, the condition that he remain here, given that it amounts to an upward departure and is an additional form of punishment for which he never received notice from the court, had no idea that the court was going to require him to stay here. Okay. But you're just arguing that's just flat error. I'm trying to figure out whether I've got an Ameline Booker error. You're arguing that we just didn't give him notice and we violated the rules. That's a little different argument. Do you have an argument here that in a system of advisory guidelines and not mandatory guidelines that there's a reason to send this back? Only based on the same position that the government suggested, which is that the court could reduce the term of supervised release if it realized that it did not have to be. How far into his term of supervised release is he right now? He is in his first. He's nearing the completion, I believe, of his first year. Okay. Thank you. Thank you. Okay. We appreciate the arguments of counsel, and the court stands recessed for the day. All rise. This court is adjourned. Thank you.
judges: Farris, Thompson, Bybee